[Cite as *State v. Donley*, 2017-Ohio-562.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NOS. 26654; 26655; |
| | : | 26656 |
| v. | : | |
| | : | T.C. NOS. 14CR1142; 14CR2391 |
| ISREAL DONLEY | : | 14CR3312 |
| | : | |
| Defendant-Appellant | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the _____17th_____ day of _____February_____, 2017.

. . . . . . . . . . .

MEAGAN D. WOODALL, Atty. Reg. No. 0093466 and HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorneys, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorneys for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, 120 W. Second Street, Suite 706, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Isreal E. Donley appeals from three separate judgments of the Montgomery County Court of Common Pleas. After Donley was found guilty by a jury of possession of cocaine and having weapons while under disability in Case No. 2014 CR 1142, he

entered no contest pleas to 27 counts of having weapons while under disability in Case No. 2014 CR 2391 and a guilty plea to illegal conveyance of drugs of abuse into a detention facility in Case No. 2014 CR 3312. In a joint sentencing hearing, the trial court ordered that the sentences in Case Nos. 2014 CR 1142 and 2014 CR 2391 run concurrently, but that the sentence in Case No. 2014 CR 3312 run consecutively to the sentences in the other cases. Donley's aggregate sentence was 13 years in prison.

{¶ 2} Donley appeals from his convictions in all three cases. For the following reasons, the trial court's judgments in Case Nos. 2014 CR 2391 and 2014 CR 3312 will be affirmed. The trial court is instructed to file a nunc pro tunc entry correcting the nature of defendant's plea in Case No. 2014 CR 2391. The trial court is also instructed to file a nunc pro tunc entry in Case No. 2014 CR 3312, correcting its judgment entry so that it accurately reflects the trial court's consecutive sentencing findings. Defendant's conviction and sentence for possession of cocaine in Case No. 2014 CR 1142 will be affirmed; his conviction in that case for having weapons while under disability will be vacated.

## I. Factual and Procedural History

{¶ 3} Donley's convictions stem from separate incidents on three dates in 2014: March 26 (Case No. 2014 CR 1142), May 14 (Case No. 2014 CR 3312), and July 8 (Case No. 2014 CR 2391).

{¶ 4} On March 26, 2014, Detective Patrick O'Connell of the Montgomery County R.A.N.G.E. Task Force observed a suspected drug transaction between the resident of a home and the driver of a white GMC Yukon. O'Connell relayed information about the transaction and the fact that the Yukon had a "very dark" window tint to Deputy Frederick

Zollers, a uniformed officer with the Task Force. After the Yukon left the residence, Deputy Zollers initiated a traffic stop of the Yukon. Donley was the driver and sole occupant of the vehicle. Zollers ran Donley's identification through his computer system and arrested Donley on an outstanding juvenile court warrant. The vehicle was later towed by Sandy's Towing to a lot in Moraine. There, the Sandy's tow truck driver found a brown knit hat with a firearm under the hood of Donley's vehicle, and another Sandy's driver located a brown knit glove on the gas cap. Cocaine was discovered inside the glove.

{¶ 5} On April 4, 2014, Donley was indicted in Case No. 2014 CR 1142 for possession of cocaine (equal to or greater than 27 grams, but less than 100 grams) and for having weapons while under disability (prior felonious assault conviction in 2003) related to events on March 26, 2014. Donley was released on bond on April 9, 2014.

{¶ 6} At approximately 2:15 a.m. on May 14, 2014, State Highway Patrol Trooper Brenton stopped Donley for traffic violations. The trooper discovered that Donley had a misdemeanor warrant from juvenile court for a "DNA parenting evaluation." Trooper Brenton arrested Donley on the warrant and transported him to the Montgomery County Jail. While en route to the jail, Brenton asked Donley if he any illegal contraband on his person. Donley denied having any drugs. Upon being searched at the jail, a corrections officer found a clear plastic baggie rolled up in the front part of Donley's underwear. Inside the baggie were 27 capsules of suspected cocaine and 46 capsules of heroin. The amount of confiscated cocaine was 0.054 grams, and the amount of confiscated heroin was 1.009 grams. Donley was released from jail later that same day.

{¶ 7} At approximately 4:50 p.m. on July 8, 2014, Detective O'Connell obtained a

search warrant for Donley's DNA, and the Task Force set up surveillance on Donley's residence based on its belief that Donley was trafficking in narcotics. A vehicle stopped at Donley's residence, and the officers observed Donley engage in conduct consistent with a drug transaction. When Donley left his residence in a Chevy Suburban, officers stopped the vehicle to obtain Donley's DNA sample. At 9:05 p.m. on the same day (July 8), Detective O'Connell obtained a second search warrant for Donley's residence. A search of the residence uncovered nine guns and several bulletproof vests hidden in an L-shaped enclosure above the kitchen cabinets.

{¶ 8} On July 17, 2014, Donley was indicted in Case No. 2014 CR 2391 for 27 counts of having weapons while under disability based on the nine weapons found on July 8. In Counts 1 through 9, the disability resulted from an aggravated assault conviction in 2000; in Counts 10 through 18, the disability resulted from a felonious assault conviction in 2003; and in Counts 19 through 27, the disability resulted from being under indictment for possession of cocaine in Case No. 2014 CR 1142 (above).

{¶ 9} On November 6, 2014, Donley was indicted in Case No. 2014 CR 3312 for illegal conveyance of drugs of abuse onto the grounds of a detention facility, possession of heroin, possession of cocaine, trafficking in cocaine, and trafficking in heroin based on events that occurred at the Montgomery County Jail on May 14, 2014.

{¶ 10} Donley filed motions to suppress in each of his cases. After separate hearings, the trial court denied the motions to suppress in Case Nos. 2014 CR 1142 and 2014 CR 2391. As discussed below, the motion in Case No. 2014 CR 3312 was later withdrawn.

{¶ 11} In February 2015, a jury trial was held on the charges of possession of

cocaine and having weapons while under disability, based on the cocaine and weapon found in the Yukon (Case No. 2014 CR 1142). The jury found him guilty on both charges.

{¶ 12} On March 9, 2015 (while the motion to suppress in Case No. 2014 CR 3312 was still pending), Donley entered pleas in his two remaining cases. In Case No. 2014 CR 2391, Donley pled no contest to the 27 counts of having weapons while under disability, all felonies of the third degree. The State agreed that the sentences would run concurrently with the sentence imposed in Case No. 2014 CR 1142.

{¶ 13} With respect to Case No. 2014 CR 3312, Donley pled guilty to illegal conveyance of drugs of abuse on the grounds of a detention facility, in violation of R.C. 2921.36(A)(2), a felony of the third degree. In exchange for the plea, the State dismissed the remaining four charges in that case. Donley also moved to withdraw his motion to suppress, which the trial court granted.

{¶ 14} On March 18, 2015, the trial court conducted a joint sentencing hearing for each of Donley's three cases. In Case No. 2014 CR 1142, the trial court imposed ten years in prison for possession of cocaine and three years for having weapons while under disability, to be served concurrently. The court also suspended Donley's driver's license for five years and imposed a mandatory fine of $7,500. In Case No. 2014 CR 2391, the trial court merged, as allied offenses of similar import, all 27 counts of having weapons while under disability, and the court imposed a single sentence of 36 months in prison, to be served concurrently with Case No. 2014 CR 1142. In Case No. 2014 CR 3312, the trial court imposed a sentence of 36 months in prison for illegal conveyance, to be served consecutively to the sentences imposed in two other cases (2014 CR 1142 and 2014 CR 2391). Donley's aggregate sentence was 13 years in prison.

{¶ 15} At the sentencing hearing, the trial court made the statutory findings under R.C. 2929.14(C)(4) to support the imposition of consecutive sentences in Case No. 2014 CR 3312, but those findings were not included in the court's judgment entry for that case. On March 30, 2015, the trial court filed a "supplemental termination entry" in Case No. 2014 CR 3312, setting forth the statutory findings for imposing consecutive sentences.

{¶ 16} Donley appeals from the trial court's judgment entries in his three cases, raising a combined twelve assignments of error.   We will address the cases separately.

## II. Case No. 2014 CR 1142

### (Possession of Cocaine and Having Weapons under Disability)

{¶ 17} Donley's first through seventh assignments of error relate to his convictions in Case No. 2014 CR 1142 for possession of cocaine and having weapons while under disability.

*A.  Motion to Suppress*

{¶ 18}  Donley's first assignment of error claims that the trial court erred in overruling his motion to suppress evidence.

{¶ 19} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses."   *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley,* 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30.   Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence.   *Retherford* at 592.   "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable

legal standard." *Id.*

{¶ 20} The State's evidence at the suppression hearing established the following facts.

{¶ 21} On March 26, 2014, Deputy Zollers, in uniform and a marked cruiser, was assisting the R.A.N.G.E. Task Force by performing traffic stops at the task force's request and assisting with its drug investigations. Detective O'Connell, a member of the Task Force, informed Zollers that he was watching a white GMC Yukon that was parked in the driveway of a "target residence." O'Connell reported that the Yukon had a very dark window tint, and he later stated that he had observed a suspected drug transaction between a person at the residence and an occupant of the Yukon. Another detective followed the Yukon after it left the residence. The Yukon drove past the location where Zollers was parked, and he also noticed the dark window tint. At 2:20 p.m., Zollers initiated a traffic stop based on the window tint. The Yukon stopped in the left turn lane of the street; the driver did not pull over. Because of the drug investigation, Zollers immediately called for a K-9 unit.

{¶ 22} Donley was the driver and sole occupant of the vehicle. Deputy Zollers obtained Donley's identification, and after running his information through his computer, discovered that Donley had an active warrant for his arrest. After confirming the warrant, Zollers advised Donley that he was being placed under arrest for the warrant. While Zollers was completing paperwork, Deputy Joseph Caito arrived with his canine, and the dog performed a sniff of the vehicle. The dog alerted to the presence of drugs. Zollers conducted a "probable cause search" of the vehicle, but did not locate any drugs. Zollers testified that he did not look under the hood or check the gas cap. Zollers wrote a ticket

for the window tint violation.

{¶ 23} At the request of a Montgomery County sheriff's deputy, Ronald Brocar, a tow truck driver for Sandy's Towing, came to the scene to tow the Yukon. Brocar placed the Yukon on a dolly (off the ground). Before he left with the vehicle (and after Zollers had left to take Donley to jail), a man pulled up and asked Brocar to allow him into the Yukon. Brocar responded that he could not allow it, and the vehicle was towed to the Sandy's lot in Moraine.

{¶ 24} At the Sandy's lot, Brocar lowered the vehicle back onto the ground and went to start the vehicle. The vehicle would not start. Brocar then popped the hood to jump start the vehicle, at which time he discovered a brown knit hat sitting on top of the battery. Brocar picked up the hat and discovered a firearm inside of it. Brocar contacted the Sheriff's Office to retrieve the gun. Deputy Zollers was notified, and he asked for an evidence technician to respond to the Sandy's lot. Deputy James Gisewite responded to Sandy's lot and began to photograph and collect evidence. Deputy Zollers also returned to Sandy's.

{¶ 25} According to Brocar, after both deputies had arrived, Doug Franklin, another Sandy's driver, noticed something sticking out of the gas tank. Franklin took a pen, opened the gas tank's lid, and discovered a brown glove on top of the gas cap. Deputy Gisewite told Franklin not to touch it. The deputy photographed and removed the glove from the vehicle. Inside the glove was a white substance, which was later found to be cocaine.

{¶ 26} The trial court denied Donley's motion to suppress. The trial court credited Deputy Zollers's testimony and concluded that Deputy Zollers had a reasonable suspicion

to stop the Yukon for the suspected window tint violation. The court further concluded that, after Donley's arrest, the officers were entitled to search the vehicle. The court stated:

> Deputy Zollers could have searched under the hood or inside the gas tank during the traffic stop, and the fact that the gun and narcotics were discovered after the vehicle was lawfully impounded does not necessitate suppression of the evidence. The Court notes that it was within Deputy Zollers' authority to have the vehicle towed because the driver was under arrest, and the vehicle would have otherwise been left unattended. Further, once the vehicle reached the impound lot, Mr. Brocar lawfully opened the trunk [sic] in order to jump the battery and move the vehicle into a parking spot. During the discovery of the gun, as well as the narcotics, Defendant's vehicle was in police custody and could be searched.

{¶ 27} On appeal, Donley challenges the trial court's denial of his motion to suppress in two respects. First, he argues that Deputy Zollers was not justified in having the Yukon towed. Second, he claims that Deputy Zollers lacked a reasonable basis for stopping the vehicle Donley was driving. We will address these arguments in reverse order, and will not address other aspects of the trial court's decision.

{¶ 28} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a

minor traffic violation. *Id.*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8; *State v. Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 10, citing *Terry*. A traffic violation gives an officer a reasonable articulable suspicion justifying a traffic stop, notwithstanding that the traffic stop may also have been a pretext to investigate suspected drug activity. *Mays* at ¶ 22; *State v. Wilcox*, 177 Ohio App.3d 609, 2008-Ohio-3856, 895 N.E.2d 597, ¶ 13 (2d Dist.); *State v. Cole*, 2d Dist. Montgomery No. 26576, 2015-Ohio-5295, ¶ 17.

{¶ 29} " 'Reasonable, articulable suspicion' is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' " *State v. Fears*, 8th Dist. Cuyahoga No. 94997, 2011-Ohio-930, ¶ 5, citing *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *State v. Scott*, 2d Dist. Clark No. 2013 CA 104, 2014-Ohio-4963, ¶ 12. The existence of reasonable suspicion is determined by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 30} In this case, Deputy Zollers was informed by Detective O'Connell that O'Connell had observed the occupant of a white Yukon with dark tinted windows engage in a suspected drug transaction with another person. When the Yukon drove by Zollers's parked cruiser, Zollers "was able to clearly see that there was a violation being window tint, because I could not see inside the vehicle, being the driver's window or the back passenger window." We have repeatedly held that a traffic stop for a suspected window-

tint violation is lawful. *See, e.g., State v. Hall*, 2d Dist. Montgomery No. 26694, 2016-Ohio-3273, ¶ 13; *State v. Cole*, 2d Dist. Montgomery No. 26576, 2015-Ohio-5295, ¶ 16; *State v. Carson*, 2d Dist Montgomery No. 26505, 2015-Ohio-4110. Thus, based on Deputy Zollers's testimony, the trial court reasonably concluded that the deputy had a reasonable and articulable suspicion to justify a traffic stop for the suspected window tint violation.

**{¶ 31}** Donley further claims that Deputy Zollers was not justified in ordering the Yukon towed, because the vehicle was registered to Donley's wife and Zollers did not try to contact the wife to have the vehicle removed while the traffic stop was in progress.

**{¶ 32}** We have discussed when a vehicle may lawfully be impounded, stating:

"In determining the lawfulness of the impoundment, authority to impound should never be assumed. A car may be impounded if it is evidence in a criminal case, used to commit a crime, obtained with funds derived from criminal activities, or unlawfully parked or obstructing traffic; or if the occupant of the vehicle is arrested; or when impoundment is otherwise authorized by statute or municipal ordinance. * * * An impoundment implies some public policy purposes being served; a legitimate purpose should not be assumed." *State v. Taylor*, 114 Ohio App.3d 416, 422, 683 N.E.2d 367 (2d Dist.1996), citing Katz, *Ohio Arrest, Search and Seizure* (1996), 224-25. "An impoundment is lawful if it is conducted pursuant to standardized police procedures. Standardized procedures for impoundment are required to ensure that a subsequent inventory search is not 'a ruse for general rummaging in order to discover incriminating evidence.' " *[State*

*v.] Clancy*, [2d Dist. Montgomery No. 18844, 2002 WL 628124, *3 (Apr. 19, 2002)], quoting *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

*State v. Jackson*, 2d Dist. Montgomery No. 25960, 2015-Ohio-3607, ¶ 14.

**{¶ 33}** At the suppression hearing, Deputy Zollers testified regarding the Montgomery County Sheriff's Office's tow policy, which was admitted as State's Exhibit 1, and he testified that he was permitted to tow the Yukon pursuant to that policy. According to the policy, Sheriff's Office employees may "remove and/or impound, or cause to be removed to the nearest garage or other place of safety, a vehicle found upon a street/highway * * * [w]hen the employee takes the driver of such vehicle into custody and the vehicle would by that, be left unattended." (State's Ex. 1, ¶ 2.c.)

**{¶ 34}** The Yukon was stopped in the roadway, not in a lawful parking location, and Donley, the sole occupant, was under arrest. Zollers testified that he did not contact Donley's wife, but he explained, "We did not have the time to sit there and * * * try and find someone to come and tow the vehicle for * * * the person. We've got * * * several other tasks to do." We decline to hold that Deputy Zollers was required to attempt to locate an individual to retrieve the Yukon rather than have it towed. And, there was no evidence that Donley's wife would have been available to retrieve the vehicle before the traffic stop was completed, even if she had been contacted. Based on the tow policy, the deputy was authorized to have the Yukon towed.

**{¶ 35}** Donley's first assignment of error is overruled.

*B. Sufficiency and Manifest Weight of the Evidence*

**{¶ 36}** Donley's second and third assignments of error claim that his convictions

were based on insufficient evidence and were against the manifest weight of the evidence.

{¶ 37} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 38} An argument challenging the weight of the evidence differs from one challenging its sufficiency; an argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 39} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL

476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 40} On appeal, Donley claims that there was insufficient evidence to establish that he possessed the gun and the cocaine located in the Yukon, and he asserts that his convictions were against the manifest weight of the evidence.

{¶ 41} At trial, the State presented the testimony of four law enforcement officers (Detective O'Connell and Deputies Zollers, Caito, and Gisewite), the two Sandy's tow truck drivers (Brocar and Franklin), and two forensic scientists from the Miami Valley Regional Crime Lab (Jennifer Watson and Amy Dallaire). Donley did not offer any witnesses. The State's evidence established the following facts.[1]

{¶ 42} On March 26, 2014, Detective O'Connell and other officers were surveilling the home of an upper-level drug dealer as part of a R.A.N.G.E. Task Force investigation. In the early afternoon, a white GMC Yukon approached the residence and parked in the driveway. The resident came out of his front door, approached the Yukon, and opened the passenger door. The resident and the driver, later identified as Donley, had a brief conversation.

{¶ 43} Leaving the passenger door open, the resident went back into his home for

---

[1] The evidence at trial generally expanded upon the testimony presented at the suppression hearing. However, there are some minor discrepancies in the facts presented at the two hearings.

a minute or two and then returned to the passenger door. Donley appeared to direct the resident to close the door. The resident walked around to the rear driver's side of the Yukon (near the gas tank), and Donley exited the vehicle and met him there. Detective O'Connell saw the resident lean forward toward Donley, but much of his view was obstructed by the Yukon. O'Connell did not see any transaction occur, and he could see only Donley's feet. After five to ten seconds, the resident returned to his home, and Donley re-entered his vehicle and drove away. O'Connell contacted Task Force officers in marked cruisers and requested that they conduct a traffic stop of the Yukon based on a window tint violation. An unmarked police vehicle followed the Yukon until a marked cruiser initiated a stop.

{¶ 44} Deputy Zollers, a uniformed officer in a marked cruiser, received the radio call from Detective O'Connell at approximately 2:20 p.m. Soon thereafter, he saw the Yukon drive by, and Zollers observed the dark tinted windows. At approximately 2:30 p.m., Zollers initiated a traffic stop based on the window tint. Donley stopped his vehicle in the left turn lane of the road.

{¶ 45} Zollers had Donley step out of the vehicle and obtained Donley's driver's license. After running Donley's information, he learned that the vehicle belonged to Donley's wife, Alma, and that there was an arrest warrant for Donley from juvenile court for a child support issue. Zollers placed Donley under arrest, called for a K-9 unit to do a sniff of Donley's vehicle, and began paperwork. Deputy Caito arrived with his dog within a few minutes. Caito began to walk his dog around the vehicle, starting at the front driver's side of the Yukon; the dog alerted to the odor of drugs at the area between the front and rear driver's side doors. Caito terminated the sniff and returned his dog to his

cruiser.

{¶ 46} Deputy Zollers searched the interior of the Yukon, including behind loose panels, under consoles, in the dashboard, and in the glove box; Deputy Caito initially assisted with the search of the passenger side of the vehicle, but left the scene before the search was completed.  At one point, the officers could not open the glove compartment to look inside, and Zollers asked Donley why the compartment would not open.  Donley responded that the glove compartment was like that when he bought the vehicle, and he gave Zollers permission to break it open.  The deputy was able to pry the glove box open a little bit and shine a flashlight inside.  No drugs were found inside the vehicle.

{¶ 47} Because Donley (the sole occupant of the vehicle) was under arrest, Deputy Zollers requested a tow truck to tow the Yukon.  Brocar, a driver for Sandy's Towing, testified at trial that he received a call from the Montgomery County Sheriff's Office to tow a vehicle.  When he arrived, Brocar placed the Yukon on the flatbed of his tow truck. Before he drove off with the Yukon, a man who identified himself as "his [presumably Donley's] brother" asked if he could get something out of the vehicle.  Brocar responded, "It's a police impound.  There's no way."  Brocar took the Yukon to the Sandy's lot in Moraine.

{¶ 48} Brocar testified that he unhooked the Yukon and went to start it up to put it in a parking spot, however the Yukon would not start.  Brocar looked under the hood to see if there were a mechanical problem, and he found a brown wool knit hat lying on top of the battery.  The hat felt heavy, and Brocar discovered a gun with a mazagine inside of the hat.  Brocar placed the gun and hat where he had found them and called the

Sheriff's Office. (Brocar later discovered that there was a loose connection to the battery.) Franklin, another Sandy's driver, was standing with Brocar when he discovered the gun.

{¶ 49} Deputy Gisewite, an evidence technician, responded to the Sandy's lot. He spoke with Brocar and took photographs of the Yukon. He identified the gun that Brocar found as a Glock 26 with a 33-round magazine. He collected the hat, gun, and magazine. Gisewite took four DNA swabs of the gun and collected 24 9mm bullets. The parties stipulated to the operability of the firearm.

{¶ 50} While Deputy Gisewite was collecting evidence related to the gun, Franklin, "out of curiosity," flipped open the lid to the gas tank with a pen to see if anything were there, too. (The gas tank was on the rear driver's side panel of the Yukon.) Franklin saw a pair of brown jersey gloves wadded up on top of the gas cap. Gisewite told Franklin not to touch them, and the deputy took the gloves out. The deputy found a baggie with a white powdery substance inside a glove; Gisewite swabbed the baggie for DNA. Jennifer Watson of the Miami Valley Regional Crime Lab (MVRCL) identified the substance inside the glove as an off-white chunky powder containing cocaine. The total weight of the substance was 70.22 grams, plus or minus 0.02 grams.

{¶ 51} Detective O'Connell testified that Donley could not lawfully possess a firearm due to a prior conviction for felonious assault in 2003. O'Connell identified the judgment entry for that conviction (State's Exhibit 6).

{¶ 52} Detective O'Connell testified that, on July 8, 2014, he obtained a sample of Donley's DNA pursuant to a search warrant. At that time, officers conducted searches on other vehicles registered to Alma that Donley used. During a search of a white

Cadillac located in front of Donley's residence, officers found brown gloves underneath the hood in the engine compartment. O'Connell testified that these gloves were "similar" to the garments found on March 26, and a photograph of these gloves was admitted into evidence.

**{¶ 53}** Amy Dallaire, a forensic scientist in the serology DNA section of MVRCL, testified that law enforcement submitted for analysis DNA swabs from the baggie, 24 9mm rounds, a brown knit hat, a firearm and a magazine, and a standard from Brocar. The lab already had the DNA sample from Donley. Dallaire testified that the gun swab did not contain sufficient DNA to analyze. Dallaire got a partial mixed profile from the swabs from the baggie, but she was able to exclude Donley as a possible contributor to that mix. There was no testimony regarding any DNA testing of the bullets or the hat.

**{¶ 54}** Donley was convicted of having weapons while under disability, in violation of R.C. 2923.13, and possession of cocaine, in violation of R.C. 2925.11(A). R.C. 2925.11(A) prohibits a person from knowingly possessing drugs; possession of a drug may be either actual physical possession or constructive possession. *State v. Mabry*, 2d Dist. Montgomery No. 21569, 2007-Ohio-1895, ¶ 18. R.C. 2923.13, the weapons under disability statute, states in pertinent part: "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance * * *." In order to "have" a firearm for purposes of R.C. 2923.13, a person must actually or constructively possess it. *State v. Fleming*, 2d Dist. Clark No. 2014-CA-136, 2015-Ohio-5382, ¶ 26.

**{¶ 55}** "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a

certain nature.   A person has knowledge of circumstances when the person is aware that such circumstances probably exist."   R.C. 2901.22(B).

{¶ 56}   " 'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).   "A person has constructive possession of an item when he is conscious of the presence of the object and able to exercise dominion and control over that item, even if it is not within his immediate physical possession."   (Citations omitted.) *Mabry* at ¶ 18.   "Establishment of ownership is not required."   *State v. Rastbichler*, 2d Dist. Montgomery No. 25753, 2014-Ohio-628, ¶ 33.   In determining whether an individual possessed an item, it is necessary to consider all of the facts and circumstances surrounding the incident.   *Mabry* at ¶ 20.

{¶ 57} Here, neither the gun nor the drugs was found on Donley's person.   Rather, the gun and the cocaine were found hidden in a vehicle, the Yukon, that was registered to Donley's wife.   Donley was the driver and sole occupant of the Yukon at the time the vehicle was stopped by Deputy Zollers, and no one other than deputies and the tow truck driver had access to the vehicle after Donley was stopped.

{¶ 58} The pivotal issue is whether the State established that Donley "knowingly" possessed the drugs and the gun in the Yukon.   Donley contends that the State's evidence was insufficient, because no DNA or fingerprint evidence tied him to the drugs or gun, the vehicle was not registered to him, and no one saw him place the drugs or gun in the vehicle.

{¶ 59} The State responds that the jury could have reasonably concluded that

Donley constructively possessed the drugs and the gun in the Yukon. It emphasizes that all of the vehicles registered at Donley's address were registered to his wife, and Donley had no vehicles registered in his name; Donley was the sole occupant of his wife's Yukon when it was stopped on March 26, 2014. The State further argues that, while no one saw Donley place the gun or drugs in the Yukon, the jury could have reasonably believed that Donley placed the drugs on the gas cap during what appeared to be a hand-to-hand drug transaction at the home of a reported upper-level drug dealer. And, the State argues that the gun and drugs found on March 26 were located in similar brown knit winter attire (hat and glove, respectively), and that the hat and gloves were similar to brown knit gloves recovered at Donley's residence on July 8 under the hood of another vehicle registered to Donley's wife.

{¶ 60} We find the sufficiency issue to be a close call. Nevertheless, construing the evidence in the light most favorable to the State, the State presented sufficient evidence to prove that Donley knowingly possessed the drugs. In contrast, we conclude that there was insufficient evidence to establish that Donley knowingly possessed the gun in the Yukon.

{¶ 61} With respect to the drugs, Detective O'Connell testified that he had been part of "several hundred" investigations involving drugs and firearms, and that on March 26, 2014, he was investigating an individual "who we knew as an upper-level narcotics trafficker [who] may be in possession of a large quantity of cocaine." From O'Connell's vantage point, he was unable to see the reported drug dealer provide drugs to Donley; neither man's hands were visible. However, O'Connell did observe the man approach Donley's vehicle, talk briefly with Donley, return to his house, come back out to the Yukon,

and meet with Donley toward the rear driver's side of Donley's vehicle near where the gas tank was located; the dealer had leaned forward toward Donley. O'Connell testified that this interaction "appeared to be a hand-to-hand" drug transaction.

{¶ 62} Later that same day, after the Yukon was stopped by the police and towed at the deputy's request, drugs were located behind the gas cap; no individuals other than the deputies and the Sandy's employees had access to the Yukon between the suspected drug transaction and the discovery of the drugs. Construing the evidence in the light most favorable to the State, the jury could have reasonably concluded that Donley had purchased drugs from the drug dealer and placed them behind the gas cap of the Yukon. Thus, there was sufficient evidence that Donley knowingly possessed the drugs behind the gas cap.

{¶ 63} Constructive possession of the gun poses a more difficult issue, because there was no evidence that Donley was seen with a gun or near the front of the Yukon, where the gun was located. The fact that the gun was hidden in a brown knit hat, similar to the method (brown knit gloves) used to hide the baggie of cocaine, may suggest that the gloves and gun were hidden by the same person. However, there is no *evidence* to support this inference, particularly given the paucity of evidence about the garments and the vehicles owned by Donley's wife. It is unknown whether Donley and his wife shared the use of any or all of her vehicles and whether anyone else routinely used the vehicles. While a hat was found in the engine compartment of the Yukon and another pair of gloves (without any testimony concerning drugs or contraband) was found approximately three months later in the engine compartment of another vehicle owned by Donley's wife, there was no evidence that Donley placed either of these items in the respective vehicles or

knew of their existence. In addition, there is no evidence that Donley wore or owned brown knit hats and/or gloves. In fact, we can only speculate whether Donley or another person provided the gloves and hat in which the drugs and gun were found on March 26. Based on the State's evidence, we conclude that the evidence was insufficient to prove that Donley *knowingly* possessed the gun under the hood of the Yukon.

{¶ 64} Donley further claims that his convictions were against the manifest weight of the evidence. In his brief, he supports his claim with the following argument:

Deputy Zollers searched the vehicle and did not find the gun or drugs. There was no DNA or fingerprint evidence tying Donley to the gun or drugs. The State presented no evidence that anyone saw Donley put the gun in the engine compartment or the drugs near the gas cap. While Donley was driving the vehicle, it was registered in his wife's name. The tow driver, Ronald Brocar, was approached by a man who wanted to get into Donley's vehicle before the gun or drugs were found. That man was never identified and it is unknown what happened to him.

(Citations omitted.)

{¶ 65} Donley's manifest-weight argument emphasizes the weaknesses in the State's case. While we agree with Donley that the State did not present a strong case, the jury could have reasonably interpreted the evidence in the manner argued by the State and found that Donley possessed the drugs. We cannot conclude that the jury "lost its way" based solely on the fact that the jury could have also reasonably rejected the State's interpretation of the evidence.

{¶ 66} Donley's second and third assignments of error are overruled with respect

to the drugs.   With respect to the gun, Donley's second assignment of error is sustained, and his third assignment of error is overruled as moot.

*C. Destruction of Evidence by the State*

{¶ 67} Donley's fourth assignment of error claims that his "right to due process of law was violated when the State destroyed the cruiser video of the traffic stop." Specifically, Donley complains that the State destroyed the March 26, 2014 cruiser video from Deputy Zollers's cruiser.

{¶ 68} The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted when the State either fails to preserve materially exculpatory evidence or destroys, in bad faith, potentially useful evidence.   *E.g., State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 58 (2d Dist.). Evidence is "materially exculpatory" if it (1) possesses "an exculpatory value that was apparent before the evidence was destroyed" and (2) is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."   *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 74.

{¶ 69} "In contrast, evidence is not materially exculpatory if it is merely potentially useful.   Potentially useful evidence indicates that the evidence may or may not have incriminated the defendant.   The failure to preserve evidence that by its nature or subject is merely potentially useful violates a defendant's due process rights only if the police or prosecution acted in bad faith."   *State v. Cox*, 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 88.   "The term 'bad faith' generally implies something more than bad judgment or negligence. 'It imports a dishonest purpose, moral obliquity, conscious

wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.' "  (Citations omitted.)   *Powell* at ¶ 81.

**{¶ 70}** The defendant bears the burden to prove that the evidence in question was materially exculpatory, not merely potentially useful.   *Id.* at ¶ 74.

**{¶ 71}** There is no indication in the record that the cruiser video recording was materially exculpatory, much less that it would have any significant evidentiary value in this case.   No evidence was found during the traffic stop, and the charges were not based on anything that occurred during the traffic stop.

**{¶ 72}** Even assuming that the recording was potentially useful, there is no indication that the video was destroyed in bad faith.   Deputy Zollers testified the cruiser video of the March 26, 2014 traffic stop was categorized as a traffic stop and was destroyed in accordance with the Sheriff Office's retention policy.   He stated:

> With our cruisers, the new system that we have, everything is internal. It's saved on the car and it's downloaded via Wi-Fi when we pull into the district. The retention period at the time was 30 days on a traffic stop.   Because of the size of the server it would take to save everything that we did, we decide what we're going to save and what we're not going to save.   This traffic stop, because I failed to lift the hood and find the gun and everything, it had no evidentiary value regarding it turned in to be a traffic stop [sic], yielded a warrant arrest, and that was it.   So I didn't save it.   It was 30 days and the retention period lapsed and the video disappeared.   That's what happens. Now, if there was evidentiary value of it our policy is that we either have the detective or if we were able to do it ourself [sic] we'd burn it onto a disk and

submit it as evidence. So that's why there's nothing on this traffic stop.

{¶ 73} Defense counsel asked, as a follow-up question: "So you're telling me somehow because it wound up as a tint case instead of a major narcotics case and a major gun case, a 30 day window occurred and the thing was erased. Is that what you're telling the people on the jury?" Deputy Zollers responded affirmatively.

{¶ 74} Based on the record before us, Donley has not demonstrated that his right to due process of law was violated when the State destroyed Deputy Zollers's cruiser video of the traffic stop. Donley's fourth assignment of error is overruled.

*D. Ineffective Assistance of Counsel*

{¶ 75} Donley's fifth assignment of error claims that he received ineffective assistance of counsel at trial.

{¶ 76} In general, we review alleged instances of ineffective assistance of trial counsel under the two-pronged analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688.

{¶ 77} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the trial would have been different. *See id.*; *Bradley* at 142. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision

concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 58.

**{¶ 78}** Donley claims that his trial counsel should have objected to the prosecutor's characterization of constructive possession during jury selection. Donley states that the prosecutor used an example that implied to the prospective jurors that a defendant did not need to know that the item was in his or her possession in order to constructively possess it. Donley claims that the jury may have been misled by this example and that he could have been found guilty of constructively possessing the drugs and/or gun even without proof that he knowingly possessed those items.

**{¶ 79}** During jury selection, the prosecutor discussed possession with the prospective jurors. He stated:

[PROSECUTOR:] * * * Now, one of the things that we're going to talk about and one of the things that you're going to hear instructions from the Judge and arguments from us is about what it means to have possession of something. Now, there are two types of possession. And the Judge is going to instruct you on this. The first one would be actual possession. This is a pen. I hold it in my hand. Does anybody doubt that I am possessing this pen right now? Okay.

Now, another type of possession is what's called constructive possession. And again, the Judge is going to instruct you about what that specifically means. But it basically means that you have dominion over or control over an item even if you don't actually have it in your hand. Now, if

I put this pen down and I walk away, does anybody doubt that that is still my pen?   Okay.

Now let's pick on somebody here.   [Juror #1], do you have a purse with you?

[JUROR #1]: Yes.

[PROSECUTOR]:   Okay. I'm not going to go through it.   Don't worry. Now, let's say I walk over to you and I take this pen and I put it in your purse. You pick up your purse, you walk out the courtroom with that pen in your purse.   Do you agree with me that you possess that pen now?

[JUROR #1]: Yes.

[PROSECUTOR]: Does anybody disagree that [Juror #1] possessed that pen at that point? All right.

{¶ 80} We agree with Donley that the prosecutor's example of placing a pen in the prospective juror's purse did not clearly address whether constructive possession required knowledge of the presence of the item, i.e., the pen.   Regardless, the trial court properly instructed the jury on the charged offenses following closing arguments.   As part of these instructions, the court defined "knowingly" and "possession" for the jury.   The court instructed that "[c]onstructive possession exists when an individual is able to knowingly exercise dominion or control over an object even though he is not within immediate physical possession."   Any misstatement by the prosecutor regarding constructive possession was cured by the trial court's proper jury instructions prior to deliberations.   *See, e.g., State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 293 (trial court's proper final instructions cured any misstatements by defense

counsel during closing argument about standard to apply); *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 236-237 (trial court's correct instructions of law cured any incorrect "shorthand references to legal concepts" by defense counsel during voir dire); *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 147 ("trial court's correct instruction of the law with regard to the weighing process cured counsel's much earlier misstatements" during voir dire).

{¶ 81} Donley's fifth assignment of error is overruled.

*E. Batson Challenge*

{¶ 82} In his sixth assignment of error, Donley claims that the trial court erred in denying his *Batson* challenge to the State's use of a peremptory challenge.

{¶ 83} In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause forbids the State from exercising a peremptory challenge to excuse a juror solely because of that juror's race. *See also State v. Murphy*, 91 Ohio St.3d 516, 747 N.E.2d 765 (2001) (applying *Batson*). "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors[.]" (Citations omitted.) *Batson*, 476 U.S. at 86. The Supreme Court has extended *Batson* to criminal defendants who are not of the same race as the excluded jurors. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Neither the effectiveness of *Batson* nor the wisdom of allowing peremptory challenges is before us. *Compare, e.g., State v. Saintcalle*, 178 Wash.2d 34, 309 P.3d 326 (2013) (discussing racial discrimination in jury selection and the shortcomings of *Batson* ).

{¶ 84} A *Batson* question involves a three-step analysis:

First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. *Batson*, 476 U.S. at 82, 106 S.Ct. 1712, 90 L.Ed.2d 69. * * * The remaining stages are whether the prosecutor has met his burden of articulating a race-neutral reason for the peremptory challenge, and, if the prosecutor does so, then the trial court must decide whether the prosecutor's race-neutral explanation is credible, or is instead a pretext for unconstitutional discrimination. *State v. Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 49-50.

*State v. Russell*, 2d Dist. Montgomery No. 24443, 2012-Ohio-422, ¶ 55. "Review of a *Batson* claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. * * * Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination." *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 102, 676 N.E.2d 872 (1997).

{¶ 85} Here, defense counsel objected to the State's third peremptory challenge, which sought to remove Juror 11, an African-American woman. Defense counsel argued that Juror 11 had "said or done nothing on that juror (sic) to indicate in any way that there would be a legitimate challenge for her, including peremptorily. She indicated that her car had been broken into and that's about the only significant thing that she said." Upon inquiry from the trial court, the State stated that its use of a peremptory challenge on Juror 11 had "nothing to do with race" and was based on the juror's "demeanor." The

prosecutor explained:

> It – it's her demeanor on the stand -- or sitting up there, the observations in watching her, she seemed a little lacksadaisical (sic) like not wanting to be here. She didn't seem to be paying attention like the others, just kind of not all there. She just didn't strike me as somebody who would pay attention to the details that this case needs to have with it for a potential juror.

Defense counsel was provided an opportunity to respond. He argued that the State's objection was "nebulous" and that he "saw none of the things that the Government claims they are seeing with this [juror]."

**{¶ 86}** The trial court found the State's explanation to be credible. It stated:

> [Defense counsel], I agree with what you said, that the Court observed her, but I disagree with the Court's -- your accession [sic] of the Court's observations. I actually noticed the same thing the State did in her behavior in the jury box. In fact, I was making a note of it as we [were] going along. She seemed to, at one point in time, almost want to doze off. Her head was down. She wasn't making eye contact. She seemed to be very bored with the process and lacked attention of the matter. And she was the only one, at least the Court noted, that was behaving in that manner.
>
> I will also note that of the 12 jurors in the box, four are African-American. She is one of four African-Americans in the jury panel. I'm just noting that for the record. But I think the State has made a legitimate

concern because it's not necessarily all is [sic] the questions that the jury would respond to, it's also how they respond and their behavior and their actions during the voir dire process.

And based upon that, I'm going to allow the peremptory challenge and overrule the *Batson* ruling at this time.

{¶ 87} Based on the record, the trial court did not err in denying Donley's *Batson* challenge to the State's use of a peremptory challenge on Juror 11. The State set forth a race-neutral reason for its use of the peremptory challenge, and the trial court found that reason to be credible. The trial court's acceptance of the State's proffered race-neutral grounds for its preemptory challenge is not clearly erroneous.

{¶ 88} Donley's sixth assignment of error is overruled.

*F. Imposition of Fine*

{¶ 89} Donley's seventh assignment of error claims that the trial court erred in imposing a mandatory fine of $7,500. Donley states that he had filed a financial disclosure form and an affidavit of indigency, and he asserts that the trial court did not consider his present and future ability to pay the fine.

{¶ 90} On March 3, 2015, which was after his jury trial, but before the sentencing hearing, Donley filed a financial disclosure/affidavit of indigency form, using the form usually used to request appointed counsel. Donley indicated that he was unemployed and that he had no income, expenses, or assets. At sentencing, the court imposed a fine of $7,500, the mandatory minimum, for possession of cocaine. The court stated to defense counsel that he "certainly can file a motion with the Court" to consider Donley's indigence. Defense counsel indicated that "we already have filed it." The court

responded that it would "consider that. But right now * * * I will impose that [fine], and we'll consider that."

**{¶ 91}** The trial court's judgment entry provided: "The Court hereby determines that the defendant is not an indigent person for the purpose of paying the statutory mandatory fine. Therefore, the defendant is ORDERED to pay a mandatory fine of **$7,500** through the Montgomery County Clerk of Court's Office." (Emphasis sic.)

**{¶ 92}** R.C. 2929.18(B)(1) provides:

For a first, second, or third degree felony violation of any provision of Chapter 2925., 3719., or 4729. of the Revised Code, the sentencing court shall impose upon the offender a mandatory fine * * *. If an offender alleges in an affidavit filed with the court prior to sentencing that the offender is indigent and unable to pay the mandatory fine and if the court determines the offender is an indigent person and is unable to pay the mandatory fine described in this division, the court shall not impose the mandatory fine upon the offender.

**{¶ 93}** "For purposes of the statute, being 'indigent' and being 'unable to pay' are not the same. Indigency concerns a defendant's current financial situation, whereas an inability to pay encompasses his future financial situation as well." *State v. Plemons*, 2d Dist. Montgomery Nos. 26434, 26435, 26436 & 26437, 2015-Ohio-2879, ¶ 7. The defendant bears the burden of proving that he or she is indigent and unable to pay the mandatory fine. *Id.* at ¶ 8.

**{¶ 94}** "[A] hearing is not required on a defendant's ability to pay a mandatory fine, and a trial court need not make specific findings on the issue. A trial court need only

consider the issue, which it frequently can do by reviewing a pre-sentence investigation report that contains enough pertinent information." *Id.* We review the trial court's decision for an abuse of discretion. *Id.*

**{¶ 95}** In *Plemons*, we emphasized that the fine was mandatory unless the defendant alleged in a presentence affidavit that he was indigent *and* was unable to pay the mandatory fine. *Id.* at ¶ 9. As with Donley, Plemons had completed a financial disclosure/affidavit of indigency form utilized for determining whether the defendant was entitled to appointment of counsel. The form did not mention Plemons's ability to pay the mandatory fine. We found the affidavit in *Plemons* to be insufficient, saying:

> Merely alleging indigency and an inability to afford private counsel does not establish an inability to pay a fine. Indeed, "[a] finding of indigence for purposes of appointed counsel does not shield the defendant from paying a fine." " 'This is because the ability to pay a fine over a period of time is not equivalent to the ability to pay legal counsel a retainer fee at the onset of criminal proceedings.' " Plemons' failure to file a pre-sentence affidavit alleging that he is indigent and is unable to pay the mandatory fine is, alone, a sufficient reason to affirm the trial court's decision. Absent such an affidavit, R.C. 2929.18(B)(1) made the fine mandatory.

(Citations omitted.) *Plemons* at ¶ 9.

**{¶ 96}** Donley's presentence affidavit addressed his current indigence, but failed to indicate that he was unable to pay the mandatory fine. Based on this deficiency alone, we could affirm the trial court's imposition of a fine.

**{¶ 97}** Nevertheless, the trial court indicated that it would consider Donley's

request for waiver of the mandatory fine. Upon review of the record, including the presentence investigation, we cannot conclude that the trial court abused its discretion in imposing the fine.

{¶ 98} At the time of his presentence investigation, Donley was 41 years old, was indigent, and had no assets. However, Donley reported to the presentence investigator that he was in good physical health and that, prior to being incarcerated for the instant offenses, Donley had been employed at P and K Productions for seven years. The report does not indicate his income from that employment. Donley had worked for Wendy's for one year in 1999. Donley claimed to have been diagnosed with schizophrenia by an unknown doctor in 2014, and he reported that he receives $700 per month in Social Security disability payments due to a mental health disability; the investigator was unable to verify that report.

{¶ 99} Given the information before it, the trial court did not abuse its discretion in imposing a $7,500 fine. The presentence investigation report reflects that Donley was in good physical health and, prior to the instant offenses, was able to maintain steady employment for several years. Donley's claim that he was receiving Social Security disability income for a mental health condition was unsubstantiated.

{¶ 100} Donley's seventh assignment of error is overruled.

### III. Case No. 2014 CR 2391

### (Having Weapons under Disability)

{¶ 101} Donley raises four assignments of error related to Case No. 2014 CR 2391, in which he pled no contest to 27 counts of having weapons while under disability. They state:

[8.] The termination entry incorrectly states that Donley pleaded guilty.

[9.] The trial court erred when it overruled Donley's motion to suppress in 2014 CR 2391.

[10.] The trial court erred when it overruled Donley's motion to re-open the motion to suppress hearing in 2014 CR 2391.

[11.] The trial court erred by finding Donley guilty of counts nineteen through twenty-seven in 2014 CR 2391.

*A. Judge's Signature*

**{¶ 102}** Although not an assigned error, Donley states that the judge who wrote the decision denying his motion to suppress was a different individual than the judge who presided over the suppression hearing. The record belies that assertion. The transcript reflects that Judge Singer presided over the suppression hearing for Judge Adkins. Although Judge Adkins's name is listed in the caption of the decision, the signature line has Judge Singer's name and notes that he was sitting for Judge Adkins. Judge Singer electronically signed the decision.

*B. Typographical Error in Judgment Entry*

**{¶ 103}** Donley's eighth assignment of error raises that the judgment entry incorrectly states that he pled guilty, as opposed to no contest, to 27 counts of having weapons while under disability. Donley is correct that the judgment entry should reflect no contest pleas. However, this typographical error may be corrected by a nunc pro tunc entry. *See* Crim.R. 36 ("Clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time."). The trial court's error in referring to Donley's pleas as guilty

pleas does not constitute reversible error.

*C. Motion to Suppress Rulings*

**{¶ 104}** In his ninth and tenth assignments of error, Donley claims that the trial court erred in denying his motion to suppress and in failing to reopen that issue after the court denied the motion to suppress. The motion to suppress in this case concerned the search of Donley and of his residence on July 8, 2014.

**{¶ 105}** Detectives Samuel Hemingway and O'Connell, both R.A.N.G.E. Task Force members, testified at the suppression hearing on behalf of the State. Donley and his wife, Alma, testified on Donley's behalf.

**{¶ 106}** At approximately 4:50 p.m. on July 8, 2014, Detective O'Connell obtained a search warrant for Donley's DNA based on the events of March 26, 2014. Beginning at approximately 5:00 p.m. that same day (July 8), the Task Force began surveillance of Donley's residence based on its belief that Donley was trafficking in narcotics. Detectives O'Connell, Hemingway, and Patrick Craun were in plain clothes, watching Donley's house.

**{¶ 107}** After about 30 minutes of surveillance, a maroon Hummer stopped in front of Donley's residence. Donley came out of his house and got into the back seat of the vehicle. After one to two minutes, Donley exited the vehicle and returned to his house. The Hummer left the residence.

**{¶ 108}** Detective Hemingway followed the Hummer in an unmarked vehicle, and he noticed several traffic violations. Hemingway relayed his observations to uniformed deputies in marked cruisers. At approximately 5:30 p.m., Deputy Zollers got behind the Hummer and initiated a traffic stop. Hemingway observed the traffic stop for a while.

{¶ 109} Shortly after 6:00 p.m., Detective Craun advised Hemingway that Donley had gotten into a Chevy Suburban and was getting ready to leave his residence. Hemingway returned to Donley's residence. At approximately 6:15 p.m., Detectives Craun, Hemingway, and O'Connell stopped Donley's vehicle a short distance from Donley's residence to execute the warrant for Donley's DNA. Donley was driving, and three passengers were inside. Hemingway "personally addressed" one of the passengers, and that individual was arrested for possession of heroin.

{¶ 110} While Donley was detained at his vehicle, Deputy Zollers radioed that one of the individuals in the Hummer was in possession of crack cocaine. Detective O'Connell went to the Hummer and spoke with a passenger, Victor Ojezua, after Ojezua waived his *Miranda* rights. Ojezua admitted to O'Connell that he (Ojezua) had just obtained crack cocaine and powder cocaine from Donley prior to his leaving Donley's residence. The officers believed that additional drugs might still be in Donley's residence.

{¶ 111} Detectives Hemingway and O'Connell and several uniformed deputies walked to Donley's residence and spoke with Donley's wife, whom they asked to come out onto the front porch. O'Connell believed that there was probable cause for a search warrant for the house, but he wanted to secure the house before obtaining the warrant. O'Connell and other deputies performed a protective sweep of the home. Two people, who were not identified, were in the living room and were permitted to leave the residence; Donley's small child was also at the home. No other individuals were present inside.

{¶ 112} More than two hours elapsed between the protective sweep and when the search warrant was obtained at approximately 9:00 p.m. During that time, Donley was

detained, handcuffed, in the back of a cruiser. Mrs. Donley and the Donleys' child remained on the porch with Hemingway. Donley's mother came to the residence and waited with Donley's wife.

{¶ 113} When the search warrant was executed, Detective Hemingway searched the kitchen area. He noticed above the cabinets that there were some boards "that appeared to be * * * like a home-remodeling type situation where it was apparent they weren't probably originally there. I noticed that one of the boards on the end that hung over a set of cabinets was loose." Hemingway said that it looked "odd" and "out of place." Hemingway advised O'Connell that they should look behind the board. O'Connell removed the board and noticed a large caliber long-rifle hidden there. The boards were arranged around the top of the cabinets in an L shape. The officers removed all of the boards, and discovered several more guns and bulletproof vests. Detective O'Connell testified that drug paraphernalia and cocaine residue was also found at the house.

{¶ 114} According to O'Connell, the search of the residence pursuant to the warrant lasted between one and three hours; Donley remained in the cruiser the entire time. Donley was transported to jail at 1:00 a.m.

{¶ 115} At a later time, Hemingway and O'Connell went to the firing range and determined that all of the guns were operable.

{¶ 116} Donley's witnesses presented a different version of events related to the officers' entry in to Donley's home.

{¶ 117} Alma Donley testified that she lived at her residence with Donley, her three-year-old daughter, and Donley's mother, who owned the house. Alma and Donley had lived there since early 2008. She stated that around 3:30 p.m. on July 8, 2014,

Donley left to go to the store. Immediately afterward, a female friend, who Alma knew as Shorty, and Shorty's husband (whose name Alma did not know) came to the door and told Alma that the police had stopped Donley's vehicle down the street. Alma stepped outside and saw that her husband was surrounded by the police. She also saw four officers walking up the street toward her house. Alma went inside and locked her front screen door.

{¶ 118} As Alma was locking the front door, two of the officers, O'Connell and Hemingway, came to her front door, asked if she was Donley's wife, and told her that they needed to come inside to check to see if anyone was in the house. Alma asked if the officers had a warrant. O'Connell responded that they did not, but they needed to check the house. When Alma indicated that she was not going to let the officers inside, the officers responded that they were going to come in, and they pulled on her screen door and took out their guns. Alma testified that she agreed to come outside to talk with them, and they "pushed me out of my house."

{¶ 119} Alma stated that she called her mother-in-law on the phone, asking her (the mother-in-law) to come and get the Donleys' young daughter. Alma stated that Detective Hemingway held her arms and told her that she needed to get off of the phone. Hemingway let go when Alma hung up the phone. At that point, the officers went into the house.

{¶ 120} Alma testified that officers provided her with a search warrant at approximately 9:30 p.m. Alma remained on her porch until approximately 2:00 a.m. At some point during the evening, officers had permitted her to go into the house (accompanied by an officer) to get snacks for her child.

{¶ 121} Alma testified that she did not know that there were guns in the house, and she was "shocked" when the police told her what they had found. Alma stated that Donley records music, works in a studio, and was doing well.

{¶ 122} Donley testified that on July 8, 2014, he had made arrangements for a friend and the friend's girlfriend to come over regarding the possible sale of Alma's Cadillac to the friend for $1,800. Donley stated that the couple came by between 2:30 and 3:00 p.m.; they brought another man, who Donley later learned was Randy Heard, with them. When the four were together, Donley stated that he needed to retrieve the key for the Cadillac from his cousin, and the group got into Donley's Suburban to get the key. Donley drove around the block, and approximately eight houses from his residence, Donley was stopped by the police. Donley stated that he was boxed in by unmarked police cars, and he recognized Deputy Zollers in a marked cruiser.

{¶ 123} Donley testified that he was held for approximately seven hours. He sat on the side of the road for approximately one and one-half hours until an evidence technician came to take his DNA. After his DNA was taken, he was handcuffed behind his back and placed in the rear of a cruiser. Donley stated that he was detained based on the Hummer's visit to his house; Donley denied being involved in the sale of drugs. He also stated that he was unaware that there were weapons behind the boards in the kitchen.

{¶ 124} Donley filed a motion to suppress, challenging his stop and detention on July 8, the officers' entry and subsequent search of his residence, and the validity of the search warrants.

{¶ 125} The trial court denied the motion to suppress on November 11, 2014. The

court concluded that the initial stop and detention of Donley based on the search warrant for DNA was not unreasonable. The court found that Donley was detained for the time necessary to obtain a warrant for his home and that Donley's detention "was a reasonable balance of public and individual concerns where police have received probable cause of criminal activity." The court thus concluded that Donley's detention and the protective sweep of Donley's home were lawful. Next, the court concluded that the police had probable cause to obtain a warrant for Donley's home. Finally, the court concluded that the police had probable cause to arrest Donley based on the items found at the house.

{¶ 126} On November 12, the day after the trial court denied the motion to suppress, Donley moved to reopen his motion to suppress, claiming that O'Connell's affidavit in support of the warrant for Donley's house included false and misleading information. Donley attached an affidavit from Victor Ojezua, who stated that he never told any police officer that he had bought drugs from Donley and that O'Connell's statement in the affidavit about his conversation with Ojezua was false.

{¶ 127} The trial court overruled the motion to reopen the suppression motion, reasoning:

Upon review of the evidence in support of the search warrant for Defendant's home, it is clear to the Court that Mr. Ojezua's statements were not necessary to establish probable cause. Even if Mr. Ojezua did not speak to anyone about Defendant, the detectives still observed behavior indicating drug trafficking at Defendant's home, and Mr. Ojezua was found with drugs after leaving Defendant's property and engaging in what appeared to be a drug transaction.

{¶ 128} On appeal, Donley claims that the police arrested him on July 8 without probable cause after they obtained his DNA sample, and that the police illegally searched his home without a warrant and had no basis for the protective sweep. Donley also claims that the police lacked probable cause to obtain a warrant for his home and that the search warrant did not authorize the police to pull off the boards in the kitchen. Donley further asserts that O'Connell's affidavit contained false information, and that the trial court abused its discretion in denying the motion to reopen the suppression motion.

{¶ 129} Based on the evidence presented at the suppression hearing, we agree with the trial court's denial of Donley's motion to suppress. The Task Force officers went to Donley's residence to execute a warrant for Donley's DNA and to conduct additional surveillance. During their surveillance, Detectives Hemingway and O'Connell observed Donley exit his home and apparently conduct a drug transaction in a Hummer that had driven to his house.

{¶ 130} When the officers later stopped and detained Donley soon after he left his home in a Chevy Suburban, they did so lawfully pursuant to the search warrant for his DNA. The trial court found that, "[w]hile Defendant was detained in order to allow a technician to arrive to take the DNA swab, * * * this detention was not longer than reasonably necessary."

{¶ 131} While Donley was detained pursuant to that warrant, the officers learned that Victor Ojezua, a passenger in the Hummer, told Deputy Zollers that he had just received the crack cocaine and powder cocaine from Donley. After being informed of his *Miranda* rights, Ojezua repeated this information to Detective O'Connell. Based on the officers' observations at Donley's residence and Ojezua's statements, the officers had

probable cause to arrest Donley for trafficking in cocaine, and they had probable cause to believe that additional cocaine might be present in Donley's residence.

{¶ 132} The officers were also entitled to secure Donley's residence pending the issuance of a search warrant and to conduct a protective sweep.

{¶ 133} The United States Supreme Court has held that "[s]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Segura v. United States*, 468 U.S. 796, 810, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

> When officers secure a residence pending a search warrant, they may enter that residence. However, this intrusion must be limited in time and scope. Therefore, any entry based upon exigent circumstances is " 'strictly circumscribed by the exigencies which justif[ied] its initiation.' " Thus, when a residence must be secured in order to preserve evidence, "the scope of the intrusion is limited to that necessary to secure the evidence." This may include securing "the people inside and any evidence in plain view."

(Citations omitted.) *State v. Burns*, 2d Dist. Montgomery No. 22674, 2010-Ohio-2831, ¶ 22.

{¶ 134} Moreover, "[a] protective sweep is a reasonable exception to the Fourth Amendment's warrant requirement." *State v. Mathews*, 2d Dist. Montgomery No. 26326, 2015-Ohio-1047, ¶ 10, citing *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). A protective sweep, however, is not a full search of the premises. *Id.* It is only a "cursory inspection of those areas where a person who possesses a threat of

danger to the police may be found." *State v. Young*, 2d Dist. Montgomery No. 24537, 2011-Ohio-4875, ¶ 17. A protective sweep is permitted when " 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the * * * scene.' " *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 36 (2d Dist.), quoting *Buie*, 494 U.S. at 334, 110 S.Ct. 1093, 108 L.Ed.2d 276.

{¶ 135} Having concluded that there was probable cause to seek a search warrant for Donley's home, the Task Force officers reasonably sought to secure the residence to prevent the destruction of any evidence and to ensure that no one remained in the residence that might pose a danger to them while they awaited a warrant. When the officers arrived at the house, Mrs. Donley was at the front door and two individuals were present in the living room of the house. The officers reasonably conducted a protective sweep to ensure that the officers would not be endangered by any additional occupant of the house while awaiting the warrant. There is no evidence that the officers conducted a search beyond what was permitted by a protective sweep, and no evidence was seized before the search warrant was obtained.

{¶ 136} Next, Donley claims that the search warrant for his home was not supported by probable cause.

{¶ 137} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide that search warrants may only be issued upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and/or things to be seized. *See also State v. Jones*, 143 Ohio

St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, ¶ 11.

{¶ 138} In authorizing a search warrant, the issuing magistrate's duty is to determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place * * *." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Jones* at ¶ 13. "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for * * * conclud[ing]' that probable cause existed." *Gates* at 238-239, quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 35. Ordinarily, "a probable cause inquiry must be confined to the four corners of the affidavit." *State v. Klosterman*, 114 Ohio App.3d 327, 333, 683 N.E.2d 100 (2d Dist.1996). In reviewing whether a search warrant has been issued upon probable cause, courts must examine the totality of the circumstances. *Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, at ¶ 15.

{¶ 139} Trial courts and appellate courts "should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph two of the syllabus; *Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, at ¶ 14.

{¶ 140} Detective O'Connell's affidavit in support of the search warrant described his extensive experience investigating drug trafficking and drug trafficking organizations. O'Connell stated in the affidavit that on July 8, 2014, the Montgomery County R.A.N.G.E. Task Force, to which he was assigned, conducted surveillance on Donley's residence in an attempt to locate Donley pursuant to a signed DNA search warrant.

{¶ 141} The affidavit stated that, during the surveillance, two vehicles approached Donley's residence. First, O'Connell observed a white pick-up truck with two individuals arrive at Donley's residence, and the two individuals "made brief contact with Donley on the porch" of Donley's house. Within two to three minutes, the pick-up and its occupants left the area without being contacted by law enforcement. The second encounter involved the Hummer. O'Connell's affidavit described this encounter as follows:

d. * * * The Hummer parked in front of the residence and Det. Craun observed Isreal Donley exit his residence and enter the rear passenger seat of the vehicle.

e. Donley remained in the rear passenger seat of the Hummer for approximately 2 minutes which was consistent with drug transactions.

f. Your affiant had prior contact with Donley on March 26, 2014 at which time Donley was found in possession of a large quantity of cocaine and a firearm.

g. Detective Craun then observed Donley exit the vehicle and re-enter [his residence]. The Hummer and two (2) occupants then left the area.

h. Deputy Zollers observed the Hummer violate traffic laws and initiated a traffic stop. Deputy Zollers and Deputy Shiverdecker made contact with the driver, Raphael Ojezua, and the passenger, Victor Ojezua.

i. Deputy Shiverdecker performed a search of Victor Ojezua and located a large quantity of suspected crack cocaine and power cocaine concealed on his person.

j. The driver, Raphael Ojezua was found to be on parole and had a large

quantity of cash on his person.

k.   Your affiant interviewed Victor Ojezua, post Miranda and he stated he received the crack cocaine and powder cocaine from Isreal AKA: Izzy who resides at [Donley's address] on July 8, 2014 as observed by detectives.

{¶ 142} O'Connell's affidavit further described how Donley exited his residence and entered a dark blue Chevy Suburban, that was also occupied by two additional men and a woman.  This vehicle was stopped to execute the search warrant for Donley's DNA.  O'Connell stated in the affidavit that the rear passenger was found to have heroin in his right pants pocket, and the front seat passenger was known to O'Connell from a prior drug investigation in which drugs were seized.

{¶ 143} Based on the four corners of the affidavit, the magistrate had a "substantial basis" for concluding that there was probable cause to believe that evidence of drug possession and drug trafficking would be found in Donley's residence.  O'Connell was experienced in drug trafficking investigations, and shortly before seeking the search warrant, he observed Donley come out of his residence and engage in conduct that was consistent with drug transactions.  One of the occupants of the Hummer, Victor Ojezua, told the detective that he (Ojezua) had just received crack cocaine and powder cocaine from Donley, as observed by the detective.  Approximately three months before, Donley was found to be in possession of a large quantity of cocaine and a firearm.  The magistrate reasonably concluded that there was probable cause to believe that drugs, firearms, and other evidence of drug trafficking would be found in Donley's residence.

{¶ 144} We also conclude that the officers were permitted to look behind the boards above the kitchen cabinets as part of their search.  Courts employ a

"reasonableness" standard to determine whether destruction of property was "reasonably necessary to effectively execute a search warrant." *E.g., United States v. Church*, 823 F.3d 351, 364 (6th Cir.2016) (officers did not act unreasonably in using a prying ram to open defendant's safe while executing search warrant). "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." *United States v. Ramirez*, 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998). But, "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979).

**{¶ 145}** The search warrant authorized the officers to search Donley's residence and the surrounding curtilage for controlled substances, firearms, and other specified items connected with the commission of possession of drugs and drug trafficking. In executing the warrant, Officer Hemingway noticed a loose board above some kitchen cabinets that looked that it was not original to the house and was "odd" and "out of place." The officers reasonably suspected that drugs, guns, or other evidence of drug trafficking could be located behind the boards. Accordingly, the officers were entitled to look behind the boards in the kitchen, where guns were found. The discovery of the guns provided an additional basis for Donley's arrest.

**{¶ 146}** In summary, the trial court did not err in denying Donley's motion to suppress.

**{¶ 147}** Finally, Donley's tenth assignment of error claims that the trial court abused its discretion in denying his motion to reopen the suppression motion. Donley

claims that, because O'Connell's testimony that Victor Ojezua said that he had received cocaine from Donley was a key point in the decision to overrule the motion to suppress, the trial court should have reopened the motion to suppress in light of Ojezua's affidavit.

{¶ 148} At the outset, the State asserts that the trial court lacked jurisdiction to reconsider its suppression ruling. The State cites to precedent holding that a motion for reconsideration of a final judgment is a nullity. While we do not dispute that a trial court may not reconsider its final judgment, the trial court's suppression ruling was an interlocutory ruling, not the final judgment in Donley's criminal case. The trial court did not lack authority to reopen the suppression motion.

{¶ 149} The reopening of a motion to suppress for the presentation of additional testimony is within the sound discretion of the trial court. *State v. Black*, 2d Dist. Montgomery No. 17384, 2000 WL 192258 (Feb. 18, 2000).

{¶ 150} During the suppression hearing, Detective O'Connell testified that Victor Ojezua "indicated that he had just obtained crack cocaine and powdered cocaine from Isreal Donley at [Donley's residence] -- as the detectives observed previously." On cross-examination, O'Connell emphasized that Ojezua said that he obtained, not purchased, crack and powder cocaine from Donley. O'Connell testified, "Victor Ojoezuea [sic] indicated that he had been fronted crack cocaine and powder cocaine from Isreal." O'Connell's search warrant affidavit, quoted above, was consistent with his testimony at the suppression hearing.

{¶ 151} Victor Ojezua's affidavit in support the motion to reopen stated, in relevant part:

2. On July 8, 2014, I was a passenger in a vehicle that was pulled over

for a traffic stop.   I was with my brother, Raphael Ojezua.

3.   It is my understanding that during a Suppression Hearing in the above cited matter, a police officer stated that I voluntarily gave a statement to the Police on July 8, 2014.   The Police Officer-witness stated that I went to meet Isreal Donley.   I did not even know Mr. Donley until I met him that date for the first time.   That "his people" contacted Donley for the purpose of a delivery of crack-cocaine and that I "fronted" him a quantity of crack cocaine.   I neither bought nor sold Mr. Donley any cocaine or crack cocaine on that date or ever.   This is all false.   It just never happened.

4.   That statement, that the Deputy told on the stand in the suppression hearing, is false.   I never told any police officer or detective that I bought drugs from Isreal Donley.

**{¶ 152}** "A search warrant affidavit that is facially sufficient may nevertheless be successfully attacked if the defendant can show by a preponderance of the evidence that the affiant made a false statement intentionally, or with reckless disregard for the truth." *State v. Stropkaj*, 2d Dist. Montgomery No. 18712, 2001 WL 1468905, * 2 (Nov. 16, 2001), citing *Franks v. Delaware*, 438 U.S. 154, 155-156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) and *State v. Waddy*, 63 Ohio St.3d 424, 441, 588 N.E.2d 819 (1992).   But, "[e]ven if the affidavit contains false statements [or omissions] made intentionally or recklessly, a warrant based on the affidavit is still valid unless, 'with the affidavit's false material set to one side [or with the omissions included], the affidavit's remaining content is insufficient to establish probable cause[.]' " *State v. Waddy*, 63 Ohio St.3d 424, 441, 588 N.E.2d 819 (1992), citing *Franks* at 156.

{¶ 153} Ojezua's affidavit misstates Detective O'Connell's testimony, and it is unclear whether Ojezua's denial encompasses O'Connell's statement that Ojezua indicated that he had "received" crack cocaine and powder cocaine from Donley on July 8.

{¶ 154} Regardless, we agree with the trial court that, excluding the paragraph in Detective O'Connell's affidavit regarding Ojezua's alleged post-*Miranda* statements, the affidavit still established probable cause to believe that evidence of drug possession and drug trafficking would be found in Donley's home. As stated above, the affidavit indicated that Donley had previously been found to be in possession of a large amount of cocaine and a firearm. On July 8, the date of the affidavit, experienced Task Force officers observed Donley engage in conduct at his residence that was consistent with drug transactions. After leaving Donley's residence, the individuals in the Hummer were found to be in possession of crack cocaine, powder cocaine, and a large quantity of cash. Although Ojezua's alleged statements added to the quantum of evidence in support of the search warrant, the warrant was based on probable cause, even without those statements. Accordingly, the trial court did not abuse its discretion in denying Donley's request to reopen the motion to suppress.

{¶ 155} Donley's ninth and tenth assignments of error are overruled.

*D. Counts 19 through 27*

{¶ 156} In his eleventh assignment of error, Donley claims that his convictions on Counts 19 through 27 should be reversed, because Donley was not *convicted of* possession of cocaine in Case No. 2014 CR 1142 until after he was indicted in Case No. 2014 CA 2391 for having weapons while under disability.

{¶ 157} R.C. 2923.13, which sets forth the offense of having weapons while under disability, states, in relevant part:

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

* * *

(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

(3) *The person is under indictment for* or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

(Emphasis added.)

{¶ 158} Donley was indicted on 27 counts of having weapons while under disability.  Counts 1 through 18 alleged violations of R.C. 2923.13(A)(2), based on convictions for a felony offense of violence.  Counts 1 through 9 cited his conviction for aggravated assault (deadly weapon) on April 5, 2000, and Counts 10 through 18 cited his conviction for felonious assault (deadly weapon) on May 8, 2003.

{¶ 159} Unlike Counts 1 through 18, Counts 19 through 27 alleged a violation of

R.C. 2923.13(A)(3). They alleged, in part, that Donley

> *did knowingly acquire, have, carry or use any firearm or dangerous ordnance, while the defendant was either under indictment for any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse and the defendant knew she or he was under such an indictment or was reckless in that regard* or, having been previously convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse, or has been adjudicated a delinquent child for the commission of a felony offense which if committed by an adult would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse, *being Possession of Cocaine, on April 8, 2014, in the case of* [*State*] *versus Isreal Donley, being Case Number 2014 CR 1142, in the Common Pleas Court of Montgomery County*[.]

(Emphasis added.)

**{¶ 160}** Donley was indicted for possession of cocaine in Case No. 2014 CR 1142 on April 4, 2014. He was indicted in this case (Case No. 2014 CR 2391) for having weapons while under disability on July 17, 2014. Counts 19 through 27 of his indictment in this case, which were based on his being under indictment for possession of cocaine in Case No. 2014 CR 1142, were consistent with the language of R.C. 2923.13(A)(3). The trial court did not err in finding Donley guilty, upon his no contest plea, to Counts 19 through 27.

{¶ 161} Donley's eleventh assignment of error is overruled.

## IV. Case No. 2014 CR 3312

## (Illegal Conveyance of Drugs of Abuse onto the Grounds of a Detention Facility)

{¶ 162} Donley's twelfth assignment of error relates to 2014 CR 3312. It states: "The trial court erred when it imposed the maximum sentence in 2014 CR 3312."

{¶ 163} On appeal, Donley claims that the record did not support the trial court's decision to impose the maximum 36-month sentence for his conviction for illegal conveyance of drugs of abuse onto the grounds of a detention facility. He states, "[I]n light of the ten years imposed in 2014 CR 1142, the record does not support any more than a minimum term in 2014 CR 3312."

{¶ 164} In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law.

{¶ 165} "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in exercising its discretion, a trial court must consider the statutory criteria that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d

500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 166} R.C. 2929.11 requires trial courts to be guided by the overriding purposes of felony sentencing. Those purposes are "to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). The court must "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.* R.C. 2929.11(B) further provides that "[a] sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

{¶ 167} R.C. 2929.12(B) sets forth nine factors indicating that an offender's conduct is more serious than conduct normally constituting the offense; R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious than conduct normally constituting the offense. R.C. 2929.12(D) and (E) each lists five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes. Finally, R.C. 2929.12(F) requires the sentencing court to consider the offender's military service record.

{¶ 168} Prior to imposing sentence, the trial court indicated that it had reviewed the State's sentencing memorandum, the purposes and principles of sentencing in R.C.

2929.11, and the seriousness and recidivism factors in R.C. 2929.12 for all of the cases, as well as the mandatory sentencing provisions of R.C. 2929.13 for Case No. 2014 CR 1142. The court noted that the cases before it constituted Donley's seventh, eighth, and ninth felony convictions, that his criminal history reflected drugs, weapons, and violence over a number of years, and that Donley had not taken responsibility for his actions. The court indicated that it believed Donley to be a danger to society. Donley was 41 years old.

**{¶ 169}** The record reflects that the trial court considered the statutory policies that applied to his felony offense and that the trial court imposed a sentence within the statutory range. We find nothing in the record to support Donley's contention that a maximum sentence was unlawful and unsupported by the record.

**{¶ 170}** Donley's twelfth assignment of error is overruled.

**{¶ 171}** Although not specifically raised on appeal, we note that the trial court failed to include its consecutive sentencing findings in its judgment entry. Instead, on March 30, 2015, the trial court filed a separate entry with those findings after the judgment entry had been filed. We addressed this issue in *State v. Friend*, 2d Dist. Montgomery Nos. 26867, 26868, 2016-Ohio-5868, stating:

> In order to impose consecutive terms of imprisonment, a trial court is required to make the appropriate findings at the sentencing hearing and to incorporate those findings into its sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 26 ("R.C. 2929.14(C)(4) requires the trial court to make statutory findings prior to imposing consecutive sentences, and Crim.R. 32(A)(4) * * * directs the court to state

those findings at the time of imposing sentence.") Because the trial court speaks through its journal entries, it must incorporate the statutory findings into its sentencing entry. *Id.* at ¶ 30, 16 N.E.3d 659.

We have held that a "trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *State v. Horobin*, 2d Dist. Montgomery No. 26639, 2015-Ohio-5300, ¶ 8, citing *State v. Graham*, 2d Dist. Montgomery No. 25934, 2014-Ohio-4250, ¶ 36. Such a correction of the final entry is required here in each case. The supplemental termination entries do not accomplish this purpose, because all of the required elements, including the sentence and findings relevant to it, must be incorporated into the judgment, and only one document can constitute a final appealable order. *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163, ¶ 17; *State v. Horobin*, 2d Dist. Montgomery No. 26639, 2015-Ohio-5300, ¶ 8.

*Friend* at ¶ 27-28.

**{¶ 172}** As in *Friend*, the trial court made the statutory findings at sentencing, but its supplemental entry did not accomplish the purpose of including the consecutive sentencing findings in the court's judgment entry. Accordingly, the matter must be remanded for the trial court to correct its judgment entry so that it accurately reflects the trial court's consecutive sentencing findings.

{¶ 173} The trial court's online docket reflects that on October 6, 2016, the court filed, nunc pro tunc, an amended termination entry which includes the consecutive sentencing findings. This Court has repeatedly held that, "[a]lthough a court generally may issue a nunc pro tunc entry any time,[2] * * * a notice of appeal divests a trial court of jurisdiction to do so." (Footnote in original.) *State v. Smith*, 2d Dist. Greene No. 2010-CA-63, 2011-Ohio-5986, ¶ 7; *State v. Alford*, 2d Dist. Montgomery No. 24368, 2012-Ohio-3490, ¶ 11. While we commend the trial court for attempting to correct its error, the trial court lacked jurisdiction to file its amended judgment entry while this appeal was pending, and the trial court's nunc pro tunc entry had no legal effect. However, nothing precludes the trial court from simply refiling its amended judgment entry upon remand.

## V. Conclusion

{¶ 174} The trial court's judgment in Case No. 2014 CR 1142 will be affirmed with respect to Donley's conviction and sentence for possession of cocaine; Donley's conviction and sentence in that case for having weapons while under disability will be vacated.

{¶ 175} The trial court's judgment in Case No. 2014 CR 2391 will be affirmed. The trial court is instructed to file a nunc pro tunc entry in Case No. 2014 CR 2391, correcting its judgment entry so that it reflects that Donley pled no contest in this case.

{¶ 176} The trial court's judgment in Case No. 2014 CR 3312 will be affirmed. The trial court is instructed to file a nunc pro tunc entry in Case No. 2014 CR 3312, correcting its judgment entry so that it includes the trial court's consecutive sentencing

---

[2] *See, e.g.,* Crim.R. 36 ("Clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time.").

findings.

. . . . . . . . . . . .

DONOVAN, P.J., concurs.

WELBAUM, J., dissenting:

{¶ 177} I very respectfully dissent from the majority's holding that there was insufficient evidence for the jury to find Donley guilty of having weapons under disability in Case No. 2014 CR 1142.   While it is certainly a close call, unlike the majority, I believe that when construing the evidence in the light most favorable to the State, there was sufficient circumstantial evidence for the jury to conclude that Donley constructively possessed the firearm that was discovered inside the brown wool knit hat underneath the hood of the Yukon on March 26, 2014.

{¶ 178} "In reviewing sufficiency-of-the-evidence claims, courts must remain mindful that the elements of an offense may be established by direct evidence, circumstantial evidence, or both."   (Citation omitted.)   *State v. Crossley*, 2d Dist. Clark No. 2015-CA-60, 2016-Ohio-3196, ¶ 16.   Circumstantial evidence is " 'proof of facts or circumstances by direct evidence from which [the factfinder] may reasonably infer other related or connected facts that naturally and logically follow according to the common experience of people.' "   *State v. Shabazz*, 146 Ohio St.3d 404, 2016-Ohio-1055, 57 N.E.3d 1119, ¶ 18, quoting Ohio Jury Instructions, CR Section 409.01(4) (Rev. Aug. 17, 2011).

{¶ 179} The Supreme Court of Ohio has stressed that "[i]t is * * * well-settled under Ohio law that a defendant may be convicted solely on the basis of circumstantial evidence."   (Citations omitted.)   *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d

1236 (1988). Accordingly, "[t]he State may prove constructive possession solely through circumstantial evidence." (Citation omitted.) *State v. Peterson*, 2d Dist. Champaign No. 2014-CA-1, 2015-Ohio-789, ¶ 20. "[I]n determining whether a person constructively possessed an item, we examine the totality of the relevant facts and circumstances." *State v. Harris*, 2d Dist. Montgomery No. 26810, 2016-Ohio-7097, ¶ 50. As noted by the majority, "[a] person has constructive possession of an item when he is conscious of the presence of the object and able to exercise dominion and control over that item, even if it is not within his immediate physical possession." *Mabry*, 2d Dist. Montgomery No. 21569, 2007-Ohio-1895 at ¶ 18.

{¶ 180} Under the totality of the circumstances in this case, I believe there is sufficient circumstantial evidence in the record for a reasonable juror to conclude that Donley had constructive possession of the firearm discovered inside the brown wool knit hat underneath the hood of the Yukon. The majority found that there is sufficient evidence for a reasonable juror to conclude that Donley placed drugs inside a brown glove located behind the gas-tank door of his Yukon. Accordingly, there is also sufficient evidence to find that Donley knew of and/or placed the firearm in the hat underneath the hood of his Yukon. These facts establish a modus operandi of hiding contraband in winter apparel and placing said apparel in peculiar spaces of a vehicle. This method was not only used in the Yukon driven by Donley on March 26, 2014, but also in a Cadillac parked at Donley's residence on July 8, 2014.

{¶ 181} Similar to the Yukon, a pair of brown gloves were discovered underneath the hood in the engine compartment of the Cadillac. Because the Cadillac and Yukon were titled in the name of Donley's wife, the majority concludes it is unknown whether

Donley shared use of the vehicles. However, a reasonable juror could infer from the facts that Donley used the vehicles titled in his wife's name given that it is undisputed that he was the sole driver of the Yukon during the traffic stop in question, the Cadillac was parked at Donley's residence while he was out on bond, and both vehicles had winter apparel hidden in peculiar compartments.

{¶ 182} Finally, it should be stressed that in conducting our review, the facts in evidence are required to be construed in the light most favorable to the State. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). (Other citation omitted.) In my opinion, a rational factfinder viewing the aforementioned evidence in a light most favorable to the State could have concluded that Donley constructively possessed the firearm at issue. Accordingly, I respectfully dissent from the majority's decision holding otherwise.

. . . . . . . . . .

Copies mailed to:

Meagan D. Woodall
Heather N. Jans
Robert Alan Brenner
Hon. Dennis J. Adkins